**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| FAITH CUTRONA, a single woman, | Case No. CV 06-2184-PHX-MHM |
| Plaintiff, | **ORDER** |
| vs. | |
| SUN HEALTH CORP., an Arizona corporation; and NOREEN VANCA, a single woman, | |
| Defendants. | |

Currently before the Court is Defendant Sun Health Corp.'s ("Defendant") motion for summary judgment. (Dkt. #107). Also before the Court are Plaintiff's motion to strike portions of Defendant's statement of facts (Dkt. #117); Defendant's motion to strike exhibits to Plaintiff's controverting statement of facts (Dkt. #126), and Plaintiff's motion to strike portions of Defendants' supplemental statement of facts (Dkt. #132). After reviewing the pleadings and holding oral argument on August 28, 2008, the Court issues the following order.

**I.      PROCEDURAL BACKGROUND**

On August 17, 2006, Plaintiff Faith Cutrona ("Plaintiff") filed a first amended complaint against Defendant in the Superior Court of Arizona, Maricopa County. (Dkt. #1). The case was then removed to the U.S. District Court for the District of Arizona on September 13, 2006. (Id.). Plaintiff currently asserts claims of hostile work environment,

1  disparate treatment, and retaliation in violation of Title VII of the Civil Rights Act of 1964,

2  42 U.S.C. §§ 2000e *et seq.*, and the Arizona Civil Rights Act ("ACRA"), A.R.S. § 41-1481,

3  and wrongful termination in violation of the Arizona Employment Protect Act ("AEPA"),

4  A.R.S. 23-1501(3)(c)(ii).   (Dkt. #s 107, 113).   Defendant filed the instant motion for

5  summary judgment on all of Plaintiff's claims on September 4, 2007.   (Dkt. #107).

6  Thereafter, Plaintiff filed two motions to strike various exhibits to Defendant's statement of

7  facts and supplemental statement of facts (Dkt. #s 117, 132); Defendant filed a motion to

8  strike exhibits to Plaintiff's controverting statement of facts (Dkt. #126).

9  **II.    FACTUAL BACKGROUND**

10  Defendant is a non-profit health care organization that operates the Sun Health Del

11  E. Webb Hospital in western Maricopa County.   (Defendant's Statement of Facts ("DSOF")

12  ¶1).  Plaintiff was hired as a staff nurse at Del Webb in August 1988, and at all relevant times

13  to her Complaint, Plaintiff held the position of charge nurse in Del Webb's Emergency Care

14  Services Department ("ED").   (DSOF ¶¶ 2-3).  Plaintiff was one of five charge nurses in the

15  ED; Plaintiff supervised approximately 25-30 nurses, technicians, clerks, and volunteers.

16  (DSOF 2, 4).

17  In July 2004, Defendant Sun Health hired Noreen Vanca as the Administrative

18  Director of Del Webb's ED.  (DSOF ¶7).  Sun Health allegedly hired Ms. Vanca to address

19  patient safety issues in the ED, reduce patient wait times, ensure all patients were given

20  identification bands, ensure medications were properly stored and disposed, and reduce staff

21  turnover and shortages.  (DSOF ¶7).  To that effect, Ms. Vanca met with members of the ED

22  staff on an individual basis and established several committees to involve the nursing staff

23  in addressing concerns in the ED.  (DSOF ¶7; Plaintiff's Controverting Statement of Facts

24  ("PCSOF") ¶8).  As ED Director, Ms. Vanca was responsible for setting forth the goals and

25  objectives of the ED; she saw to various administrative duties, including budgeting, finance,

26  and personnel management, and was not often on the floor of the ED overseeing staff.

27  (DSOF ¶9).  Ms Vanca assigned the charge nurses the responsibility for ensuring that ED

28  policies and procedures were followed and requested that the charge nurses report to her any

1  unresolved problems. (DSOF ¶10; PCSOF ¶10). Prior to Ms. Vanca's hire, Christy Larson,

2  Clinical Team Leader, had supervised the ED charge nurses; after Ms. Vanca's hire, the

3  charge nurses were required to report directly to Ms. Vanca. (DSOF ¶11).

4       Shortly after Ms. Vanca was hired, she and Plaintiff became friends. (DSOF ¶12).

5  Ms. Vanca often socialized with Plaintiff and other staff members outside work. (DSOF

6  ¶12). And between July 2004 and September 2004, Plaintiff believes Ms. Vanca made some

7  positive changes in the ED. (DSOF ¶14). However, Plaintiff contends that those positive

8  changes ended in September 2004 and the ED "began to go downhill." (PCSOF ¶14).

9  Specifically, in October 2004, Ms. Vanca and Plaintiff attended the Emergency Room

10  Association Leadership Conference in San Diego, California. (DSOF ¶13). At the

11  conference, Plaintiff alleges that Ms. Vanca made inappropriate and offensive comments to

12  Plaintiff about various ED employees, such as calling Ms. Larson "fat and ugly." (PCSOF

13  ¶¶ 13, 19). In addition, Ms. Vanca called the ED, and while speaking on the phone with Dr.

14  Henderson, falsely told him that Plaintiff had gotten her nipples pierced while in San Diego

15  (a statement which Ms. Vanca later repeated during a dinner with other coworkers). (PCSOF

16  ¶13).

17       Also in October 2004, Plaintiff began to report to Ms. Vanca various safety concerns

18  in the ED, including violations of rules of the Joint Commission on Accreditation of

19  Healthcare Organizations ("JCAHO") and nursing board standards with respect to the

20  confidentiality of patient labels and charts, and medications that were not properly disposed.

21  (DSOF ¶15). Plaintiff also reported that employees were not being held accountable for

22  failing to address these safety concerns. (DSOF ¶18; PCSOF ¶18).

23       In February 2005, the relationship between Ms. Vanca and Plaintiff began to

24  deteriorate. (DSOF ¶19). On February 15, 2005, Plaintiff approached Ms. Vanca and

25  informed her that she wanted to step down from her position as a charge nurse to become a

26  staff nurse. (DSOF ¶20). Plaintiff also raised her safety concerns, including concerns about

27  medication disposal, paramedic worksheets being left out, and nurses failing to complete

28  patient assignments. (DSOF ¶20). Further, Plaintiff reported her concerns about Ms.

1   Vanca's alleged inappropriate remarks and offensive behavior, such as calling employees
2   "old, fat, greasy slobs, lazy, and too slow." (DSOF ¶21). Plaintiff also allegedly raised
3   concerns about, among other things, Ms. Vanca's sexually-charged language and alleged
4   repeated reference to some Hispanic employees as "spics," reference to Jeffrey Welch, Ms.
5   Vanca's personal assistant, as "Noreen's bitch," and repeated reference to other ED
6   employees as "assholes" and "bitches." (DSOF ¶21; PCSOF ¶¶ 21, 38-41). Plaintiff
7   contends that after this meeting, Ms. Vanca became angry and commenced a "retaliatory
8   campaign" against Plaintiff, which included denying Plaintiff extra work shifts. (PCSOF ¶¶
9   22-23).

10          Shortly after her meeting with Ms. Vanca, Plaintiff held a dinner at her home with
11   other ED staff; she did not invite Ms. Vanca. (DSOF ¶25). Plaintiff contends that Ms.
12   Vanca was extremely upset and thereafter became Plaintiff's "enemy." (DSOF ¶25). Indeed,
13   on February 28, 2005, Ms. Vanca met with Plaintiff and allegedly informed Plaintiff that she
14   was upset that she had not been invited to dinner, and then admonished Plaintiff not to
15   socialize with co-workers outside of work. (DSOF ¶26; PCSOF ¶26). Plaintiff contends that
16   Ms. Vanca called her a "gila monster" and told Plaintiff that she had breached Ms. Vanca's
17   trust. (DSOF ¶26; PCSOF ¶26). Defendant contends that Plaintiff received a written
18   corrective action form at the same meeting, and that Ms. Vanca discussed with Plaintiff
19   complaints from employees that Plaintiff had brought personal issues into the workplace and
20   showed favoritism to certain employees. (DSOF ¶26). Plaintiff contests this issue, claiming
21   that she never received or signed a corrective action, and that her personnel file contained no
22   such action. (PSCOF ¶¶ 26, 27).

23          On April 2, 2005, Ms. Vanca allegedly received an anonymous complaint that
24   Plaintiff created a "tense, hostile environment" for her subordinates. (DSOF ¶27). On April
25   13, 2005, Ms. Vanca allegedly received another such complaint, alleging that Plaintiff
26   exhibited favoritism and gave certain employees favorable work assignments (DSOF ¶28).
27   In addition, on April 25, 2005, a member of the Sun City West Fire Department filed a
28   complaint that Plaintiff "deliberately delayed" care of a patient brought by ambulance to the

1   ED. (DSOF ¶29). Further, on April 28, 2005, Dr. David Bennett, an ED physician, allegedly

2   reported to Ms. Vanca that Plaintiff had made unprofessional comments about Ms. Vanca

3   and the staff turnover in the ED (something to the effect of that Ms. Vanca had "got rid" of

4   21 nurses since becoming ED Director; "21 nurses gone and still counting"). (DSOF ¶30).

5   On May 5, 2005, Plaintiff was called into a meeting with Ms. Vanca and Kelly

6   Wandschnieder, an HR representative. (DSOF ¶32). Plaintiff was informed about

7   complaints that had allegedly been received concerning her conduct, and she was issued a

8   corrective action at that time. (PCSOF ¶32). At the meeting, Plaintiff denied the allegations

9   contained in the complaints and attempted to again raise concerns about Ms. Vanca's alleged

10  discrimination and harassment before Ms. Vanca and the HR representative. (PCSOF ¶32;

11  DSOF ¶32). However, Ms. Vanca immediately stopped Plaintiff, and at the conclusion of

12  the meeting, informed Plaintiff that she was suspended with pay for the rest of the day "to

13  reflect upon her previous behavior and consider whether she could meet Sun Health's service

14  excellence principles." (Dkt. #107, p.7; DSOF ¶32; PCSOF ¶32). Following the meeting,

15  Ms. Vanca discussed Plaintiff's conduct with her supervisor, Jennifer Drago, and informed

16  her that she felt that Plaintiff had been belligerent and argumentative. (DSOF ¶33). Ms.

17  Drago then discussed Plaintiff's conduct with Gary Pastore, Director of Human Resources,

18  who allegedly informed Ms. Drago that he had received an exit interview from a former

19  employee who stated that she quit her job due to Plaintiff's conduct in the workplace.

20  (DSOF ¶34). Defendant terminated Plaintiff's employment later that day. (DSOF ¶34;

21  PCSOF ¶34).

22  **III.    STANDARD OF REVIEW**

23  Summary judgment is appropriate when the "pleadings, depositions, answers to

24  interrogatories, and admissions on file, together with the affidavits, if any, show that there

25  is no genuine issue as to any material fact and that the moving party is entitled to a judgment

26  as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of

27  establishing the absence of any genuine issue of material fact; the moving party must present

28  the basis for its summary judgment motion and identify those portions of the record that it

believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001).

A material fact is one that might affect the outcome of the case under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In addition, in order to preclude summary judgment, a dispute about a material fact must also be "genuine," such that a reasonable jury could find in favor of the non-moving party.  Id.; Anheuser -Busch, Inc. v. Natural Beverage Distrib., 69 F.3d 337, 345 (9th Cir. 1995).  In determining whether the moving party has met its burden, the Court views the evidence in the light most favorable to the nonmovant.  Allen v. City of Los Angeles, 66 F.3d 1052, 1056 (9th Cir. 1995).  The Court may not make credibility determinations or weigh conflicting evidence.  Musick v. Burke, 913 F.2d 1390, 1394 (9th Cir. 1990).  Further, the Court must draw all reasonable inferences in favor of the nonmovant.  Gibson v. County of Washoe, 290 F.3d 1175, 1180 (9th Cir. 2002).

If the moving party meets its burden with a properly supported motion for summary judgment, then the burden shifts to the non-moving party to present specific facts that show there is a genuine issue for trial.  Fed.R.Civ.P. 56(e); Matsushia Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).  The nonmovant may not rest on bare allegations or denials in his pleading, but must set forth specific facts, by affidavit or as otherwise provided by Rule 56, demonstrating a genuine issue for trial.  Fed.R.Civ.P. 56(e); Anderson, 447 U.S. at 248-49.  Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment.  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

In sum, the question on motion for summary judgment is whether the evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 447 U.S. at 521-52.  A district court is not required to probe the record in search of a genuine issue of triable fact. Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996).  The nonmovant has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. Id.; see Carmen v. San Francisco Unified School District, 237 F.3d 1026, 1028-29 (9th Cir. 2001)

1   (even if there is evidence in the record that creates a genuine issue of material fact, a district

2   court may grant summary judgment if the opposing party's papers do not include or

3   conveniently refer to that evidence).  The mere existence of a scintilla of evidence supporting

4   the nonmovant's petition is insufficient; there must be evidence from which a trier of fact

5   could reasonably find for the non-movant.  <u>Id.</u> at 252; <u>see</u> <u>Matsushita Elec.,</u> 475 U.S. at 586

6   (nonmovant's showing of "some metaphysical doubt" as to material facts insufficient).

7   **IV.    MOTIONS TO STRIKE**

8           The Court refers the parties to L.R.Civ. 7.2(m) and notes that separate motions to

9   strike are not allowed in this District.[1]  The parties are directed to read the Local Rules and

10  abide by them.

11          **A.    Plaintiff's Motions**

12          "It is well settled that only admissible evidence may be considered by the trial court

13  in ruling on a motion for summary judgment." <u>Beyene v. Coleman Sec. Serv., Inc.,</u> 854 F.2d

14  1179, 1181 (9th Cir. 1988).  In support or opposition to summary judgment, "affidavits shall

15  be made on personal knowledge, shall set forth such facts as would be admissible in

16  evidence, and shall show affirmatively that the affiant is competent to testify to the matters

17  stated therein." Fed.R.Civ.P. 56(e).  Conclusory and speculative testimony in affidavits and

18  moving papers is insufficient to raise genuine issues of fact and to defeat summary judgment.

19  <u>Thornhill Publ'g Co., Inc. v. GTE Corp.,</u> 594 F.2d 730, 738 (9th Cir. 1979).  However, "[a]t

20  the summary judgment stage, [courts] do not focus on the admissibility of the evidence's

21  form. [Courts] instead focus on the admissibility of its contents."  <u>Fraser v. Goodale,</u> 342

22  F.3d 1032, 1036 (9th Cir. 2003) (citation omitted).  As such, "hearsay evidence produced in

23

24          [1]LRCiv 7.2(m)(2) states that "[a]n objection to the admission of evidence offered in
25  support of or opposition to a motion must be presented in the objecting party's responsive
    or reply memorandum (or, if the underlying motion is a motion for summary judgment, in
26  the party's response to another party's separate statement of material facts) and no in a
    separate motion to strike or other separate filing.  Any response to the objection must be
27  included in the responding party's reply memorandum for the underlying motion and may
    not be presented in a separate responsive memorandum."
28

1   an affidavit . . .  may be considered if the out-of-court declarant could later present that

2   evidence through direct testimony, i.e. in a form that would be admissible at trial." <u>See, e.g.,</u>

3   <u>J.F. Feeser, Inc. v. Serv-A-Portion, Inc.</u>, 909 F.2d 1524, 1542 (3d Cir. 1990) (hearsay

4   evidence produced in an affidavit may be considered on summary judgment if the declarant

5   could later present the evidence through direct testimony); <u>Williams v. Borough of W.</u>

6   <u>Chester</u>, 891 F.2d 458, 465 n. 12 (3d Cir. 1989) ("hearsay evidence produced in an affidavit

7   opposing summary judgment may be considered if the out-of-court declarant could later

8   present that evidence through direct testimony, i.e. in a form that would be admissible at

9   trial.").

10         Plaintiff moves to strike defense exhibits "F" through "K," "M," and "N," and

11  paragraphs 7-9 of Exhibit "A" and paragraphs 7-15 of Exhibit "L."  (Dkt. #s 117, 132).

12  Plaintiff also requests that the Court strike the portions of Defendant's statement of facts and

13  supplemental statement of facts that rely on those exhibits.  Exhibits F, G, and H are

14  employee and third-party complaints regarding Plaintiff that were purportedly received by

15  Defendant; Exhibit I is an investigation report authored by Ms. Vanca; Exhibit J is an email

16  report made by Ms. Vanca to her supervisor; Exhibit K is compilation of exit interview

17  statements submitted by former employees of Sun Health; paragraphs 7 through 10 of Exhibit

18  A, Ms. Vanca's declaration, discuss Ms. Vanca's receipt of the complaints represented in

19  Exhibits F through H and her testimony about the investigation and email reports in Exhibits

20  I and J; Exhibits M and N are the declarations of Doug Klein and Gary Pastore, respectively;

21  paragraphs 7 through 15 of Exhibit L, Ms. Vanca's supplemental declaration, further discuss

22  the events surrounding her reports and receipt of complaints lodged against Plaintiff by

23  various employees.  After reviewing the pleadings, the Court will strike none of Defendant's

24  exhibits or corresponding statements of fact.

25         The Court finds that Exhibits F through H and K are admissible for reasons other than

26  to prove the truth of the matters asserted therein.  Exhibits F through H can be offered, as

27  Defendant's contend, to demonstrate that Ms. Vanca and Defendant were in receipt of

28  employee and third-party complaints concerning Plaintiff, without regard to whether the

substance of those complaints are accurate or truthful.  See Jones v. Los Angeles Community College Dist., 702 F.2d 203, 205 (9th Cir. 1983) (documents offered not to prove the truth of the allegations contained therein, but to show that employer had legitimate basis for believing plaintiff's conduct warranted termination).  As such, the Court will not strike Exhibits F through H and Exhibit K, or the statements of fact that rely on those exhibits.  See Phillips v. United States, 356 F.2d 297, 301 (9th Cir. 1965) (authentication not required for documents offered to show knowledge of document, rather than truth of the matter asserted therein); Reisman v. United States, 409 F.2d 780, 790 (9th Cir. 1969).  In addition, the Court finds no reason to strike Exhibit N, and paragraphs 7 through 10 of Exhibit A and paragraphs 7 through 15 of Exhibit L.  Exhibit N and the paragraphs at issue constitute statements based on personal knowledge regarding the receipt of the complaints and exit interviews at issue in Exhibits F through H and Exhibit K.  Exhibit N and the relevant paragraphs in Exhibits A and L further support the notion that Exhibits F through H and Exhibit K are being offered to establish that Ms. Vanca and Defendant were in receipt of and on notice that complaints had been filed against Plaintiff; they are not offered to establish the truth of the matters asserted within the complaints.  In addition, to the extent that matters in the subject paragraphs may constitute hearsay, the Court is satisfied that Defendant could later present the evidence contained therein through direct testimony, i.e. in a form that would be admissible at trial, and thus the Court will not strike the subject paragraphs at this time.

        Further, the Court finds that Exhibits I and J, although insufficient to constitute business records as contemplated under Fed.R.Civ.P. 803(6), are admissible as non-hearsay evidence to establish that Defendant and Ms. Vanca were placed on notice and conducted inquiries into various employee and third-party complaints concerning Plaintiff.  As such, the Court will not strike Exhibits I and J at this time.  However, the Court will strike Exhibit M, the declaration of Doug Klein.  Defendant did not disclose Mr. Klein as a witness, and although they now offer his declaration to support Defendant's knowledge and receipt of the various complaints and exit interviews concerning Plaintiff, Defendant never disclosed Mr. Klein as an individual who might have knowledge regarding the exit interviews even though

1    Plaintiff repeatedly requested information on that subject.  As such, the Court will strike
2    Exhibit M, and all references to that exhibit contained in Defendant's supplemental statement
3    of fact.

4           **B.**     **Defendant's Motion**

5          Defendant moves to strike Plaintiff's Exhibits "D," "E," "H," "I," "P," and "K."  (Dkt.
6    #126).  Exhibits D, E, H, I, and P are declarations of four former Sun Health employees and
7    one current Sun Health employee.  Plaintiff has withdrawn Exhibit K, and thus the Court will
8    strike any reference to it contained in Plaintiff's statement of facts or pleadings.  Defendant
9    contends that the remaining five exhibits present numerous evidentiary flaws, including lack
10   of personal knowledge, irrelevance, and inadmissible hearsay.  However, Defendant presents
11   its motion to the Court in a novel, yet entirely inappropriate, fashion.   In its motion,
12   Defendant labels generic evidentiary objections with letters ("a" through "f") and then
13   attaches each of the five declarations, marked up with brackets, underlines, and
14   corresponding letters to indicate the objections.  Such a motion violates numerous provisions
15   in L.R.Civ. 7.1 and 7.2.  The Court will not pick through the attached affidavits and
16   constantly refer back to a make-shift table of general evidentiary defects.  As such, the Court
17   denies Defendant's motion to strike and will consider Defendant's motion as objections to
18   admission of evidence.  With respect to Defendant's relevancy objections, obviously the
19   Court will not consider something that it believes is irrelevant to the issues presented before
20   it; with respect to Defendant's hearsay objections, the Court notes, as previously stated, that
21   hearsay is admissible if there is any way to present it in an admissible form at trial; with
22   respect to Defendant's objections regarding conclusory, vague, or ambiguous assertions, the
23   Court is required on summary judgment to draw any inferences in favor of the nonmoving
24   party.

25   **V.**    **DISCUSSION**

26         Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice
27   for an employer . . . to discriminate against any individual with respect to his compensation,

28

1  terms, conditions, or privileges of employment, because of such individual's race, color,

2  religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

3      **A.    Hostile Work Environment**

4          "Title VII is violated if sexual harassment is so severe or pervasive as to create a

5  hostile work environment." Kortan v. California Youth Authority, 217 F.3d 1104, 1109 (9th

6  Cir. 2000); see also Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 116 n. 10 (2002)

7  ("Hostile work environment claims based on racial harassment are reviewed under the same

8  standard as those based on sexual harassment.").  To establish the prima facie hostile work

9  environment claim under Title VII, "[a plaintiff] must raise a triable issue of fact as to

10  whether (1) she was 'subjected to verbal or physical conduct' because of [a protected

11  characteristic], (2) 'the conduct was unwelcome,' and (3) 'the conduct was sufficiently

12  severe or pervasive to alter the conditions of the victim's employment and create an abusive

13  work environment.'"  Manatt v. Bank of America, NA, 339 F.3d 792, 798 (9th Cir. 2003)

14  (quoting Kang v. U. Lim Am., Inc., 296 F.3d 810, 817 (9th Cir. 2002)); Willems v. City of

15  North Las Vegas, 267 Fed.Appx. 619, 620 (9th Cir. 2008) ("To establish a prima facie hostile

16  work environment claim, a plaintiff must demonstrate that she was subjected to unwelcome

17  verbal or physical conduct of a harassing nature because of a protected characteristic, like

18  gender, race, or religion, and that the conduct was sufficiently severe or pervasive to alter the

19  conditions of the victim's employment and create an abusive working environment.")

20  (citations and internal quotation marks omitted); see also Bodett v. CoxCom, Inc., 366 F.3d

21  736, 742 (9th Cir. 2004) ("[T]he Arizona Civil Rights Act is 'generally identical' to Title

22  VII, and therefore 'federal Title VII case law [is] persuasive in the interpretation of [the

23  Arizona] Civil Rights Act.'") (quoting Higdon v. Evergreen Int'l Airlines, Inc., 138 Ariz.

24  163, 165 n.3 (1983)).

25          To determine whether a work environment is sufficiently hostile or abusive to violate

26  Title VII, the Court must look at the totality of the circumstances, including the "frequency

27  of the discriminatory conduct; its severity; whether it is physically threatening or humiliating,

28  or a mere offensive utterance; and whether it unreasonably interferes with an employee's

work performance."   Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).   Title VII is violated only "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."   Id. at 21 (citation and internal quotation marks omitted).   The conduct must be "extreme" to amount to a change in the terms and conditions of the victim's employment, Kortan, 217 F.3d at 1110; however, "[t]he required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct."   Nichols v. Azteca Rest. Enters., 256 F.3d 864, 872 (9th Cir. 2001).   In addition, "[t]o be actionable under Title VII, 'a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'"   Montero v. AGCO Corp., 192 F.3d 856, 860 (9th Cir. 1999) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998)).

However, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview."   Harris, 510 U.S. at 21.   Indeed, Title VII is not a "general civility code": "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."   Meritor Savings Bank v. Vinson, 477 U.S. 57, 67 (1986) (mere utterance of epithet which engenders offensive feelings would not affect conditions of employment to sufficiently significant degree necessary for violation of Title VII); Manatt, 339 F.3d at 798 (citation and internal quotation marks omitted) (holding that co-workers' jokes about a "China man," teasing based on word mispronunciation, and gesture in which they pulled their eyes back to mock the appearance of Asians were not enough to create hostile work environment); Vasquez v. County of Los Angeles, 349 F.3d 634, 642 (9th Cir. 2003) (holding that supervisor's comments that plaintiff had a "typical Hispanic macho attitude" and that he should consider transferring because "Hispanics do good in the field" were not severe or pervasive enough to alter the terms and conditions of employment);

1    Kortan, 217 F.3d at 1110-11 (9th Cir. 2000) (holding that there was no hostile work

2    environment when a supervisor called female employees 'castrating bitches,' 'Madonnas,'

3    or 'Regina' on several occasions in plaintiff's presence; the supervisor called the plaintiff

4    'Medea'; the plaintiff complained about other difficulties with that supervisor; and the

5    plaintiff received letters at home from the supervisor).

6           It is well settled "that the fact that an individual 'consistently abused men and women

7    alike' provides no defense to an accusation of sexual harassment." McGinest v. GTE Serv.

8    Corp., 360 F.3d 1103, 1118 (9th Cir. 2004) (quoting Steiner v. Showboat Operating Co., 25

9    F.3d 1459, 1463 (1994)).   Nonetheless, in order to establish harassment based on sex

10   discrimination, Plaintiff must prove that "'members of one sex [we]re exposed to

11   disadvantageous terms or conditions of employment to which members of the other sex

12   [we]re not exposed.'" Oncale, 523 U.S. at 80 (quoting Harris, 510 U.S. at 25 (GINSBURG,

13   J., concurring)).   Plaintiff must prove that the conduct at issue was not merely tinged with

14   offensive sexual connotations, but actually constituted discrimination based on race, color,

15   religion, sex, or national origin.  42 U.S.C. § 2000e-2(a)(1); see id. ("Title VII does not

16   prohibit all verbal or physical harassment in the workplace; it is directed only at

17   'discriminat[ion] . . . because of . . . sex.'  We have never held that workplace harassment,

18   even harassment between men and women, is automatically discrimination because of sex

19   merely because the words used have sexual content or connotations.").

20          In sum, for Plaintiff "to prevail on a hostile workplace claim premised on either race

21   or sex, [she] must show, [in part, that she] was subjected to verbal or physical conduct of

22   racial or sexual nature." Gregory v. Widnall, 153 F.3d 1071, 1074 (9th Cir. 1998) (per

23   curiam).  "[I]n order to survive summary judgment, [Plaintiff] must show the existence of a

24   genuine factual dispute as to . . . whether a reasonable [Caucasian woman] would find the

25   workplace so objectively and subjectively racially [and/or sexually] hostile as to create an

26   abusive working environment." McGinest, 360 F.3d at 1112.  The Court finds that Plaintiff

27   has failed to establish a genuine issue of material fact on this point.

28

1     In this case, Plaintiff asserts a Title VII hostile work environment claim based on Ms.

2    Vanca's alleged sexual and racial discrimination/harassment.  The Court first notes that both

3    Plaintiff and Ms. Vanca are Caucasian women.  In addition, there is no question that Ms.

4    Vanca's comments were offensive and pervasive.  Plaintiff offers a laundry-list of offensive

5    comments made by Ms. Vanca: Ms. Vanca told other Sun Health employees that Plaintiff had

6    gotten her nipples pierced while attending a conference in San Diego; she called another

7    female employee a "fat, greasy, ugly slob"; she repeatedly called Mr. Welch, her male

8    assistant, "her bitch" or "Noreen's Bitch"; she called the ten-year old son of one of her

9    employees "her bitch"; she stated that Mr. Molina, a male nurse, should impregnate another

10   nurse using a turkey baster, and asked, "Why don't you guys just have sex and do it the

11   normal way?" and then stated, "No you don't want to do that because you don't know where

12   his penis has been"; she referred to Mr. Fierro, a Hispanic employee, as a "spic" and made

13   comments such as "I'll be an Irish spic," "I have to learn Mexican or I'll starve," and "she's

14   my little chiquita"; she referred to an Italian employee as a "goomba," and to a Native

15   American employee as the "Indian Princess"; she referred to a physician as a "dumb ass" and

16   to an extern as an "asshole"; she openly discussed orgasms in front of staff, volunteers, and

17   patients; she referred to two female physicians, Dr. Farricielli and Dr. Watkins, as "bitches"

18   and stated that Dr. Watkins was "incompetent," "a real trouble maker," and the "axis of evil

19   in the Emergency Room"; she asked, "Why is she being such a bitch today?," if employees

20   did not laugh at her comments; she commented to Plaintiff, "You know why she goes out

21   with him," in reference to the fact that a female nurse was dating an African-American man;

22   she called two female nurses "whiners"; she ordered employees around, pointing her finger

23   inches from their faces and waving papers around; her conduct was such that Dr. Watkins

24   asked to be transferred to another facility.  These statements establish that offensive conduct

25   regularly occurred in the workplace at the hospital, some of which could be considered

26   severe, like Ms. Vanca's reference to a Hispanic employee as a "spic."

27     However, only one of Ms. Vanca's alleged comments was actually directed at Plaintiff

28   – apparently on two separate occasions, Ms. Vanca told other employees at Sun Health that

1    Plaintiff had gotten her nipples pierced while attending a convention in San Diego,

2    California.  It is difficult to objectively characterize that statement as gender-related, as

3    required by Title VII.  Further, that statement does not rise to the level of severity that

4    triggers liability under Title VII.  See Manatt, 339 F.3d at 799 (collecting cases).  The sole

5    comment directed at Plaintiff was neither "severe" nor "pervasive" enough to establish that

6    she was subjected to an "abusive" work environment that "altered the conditions" of her

7    employment.  Although Plaintiff's allegations establish that Ms. Vanca's offensive behavior

8    made Sun Health an unpleasant place to work, there is no indication that Plaintiff was singled

9    out for poor treatment because of her gender or race.  See Castillo v. Dominguez, 120

10   Fed.Appx. 54, 58 (9th Cir. 2005).

11        Plaintiff does not allege that she herself suffered racial discrimination.  Both Plaintiff

12   and Ms. Vanca are Caucasian, and Ms. Vanca's comments were directed at others, i.e.,

13   calling a Hispanic employee a "spic," an Italian employee a "goomba," and a Native

14   American employee an "Indian Princess."  Nonetheless, Plaintiff points out that the Court

15   must look to the totality of circumstances in determining whether she was subjected to a

16   hostile work environment.

17        In addition, although Plaintiff contends that she suffered sex discrimination, asserting

18   that many of Ms. Vanca's comments were gender-related, the Court is hard-pressed to find

19   that Ms. Vanca's comments, although offensive (and in some instances extremely offensive),

20   did in fact constitute discrimination *based on* sex.  A number of the alleged comments had

21   sexual content and connotations, such as telling a male employee that he should impregnate

22   a female employee with a turkey baster, discussing orgasms in the workplace, and implying

23   that the only reason a female employee was dating an African-American male was because

24   he allegedly had a large penis.  Although offensive and inappropriate, those comments do not

25   somehow constitute discrimination based on sex, i.e., discrimination based on the fact that

26   Plaintiff is a female.  But Plaintiff also points to the fact that Ms. Vanca referred to

27   employees that "she felt did not display the type of behavior she felt appropriate" as

28   "bitches."  Ms. Vanca repeatedly referring to her male assistant as "her bitch," and at various

times referring to some female employees as "bitches." Thus, the question becomes whether Ms. Vanca's use of the word "bitch" constitutes discrimination based on sex and can be found to be both severe and pervasive.

There is no dispute that Ms. Vanca's use of the word "bitch" was pervasive. However, the Court finds no need to engage in a general analysis of the word "bitch" and its various uses and connotations to determine when and how such a word can, depending on the circumstances, be sufficiently severe to alter the conditions of an individual's employment and create an abusive work environment (although the Court notes that the use of the term "castrating bitch" has been found insufficient to establish a hostile work environment, see Kortan, 217 F.3d at 1110-11). Here, given the evidence in the record, the Court finds that Ms. Vanca's use of the word "bitch" is not sufficient to constitute discrimination based on sex.

First, although Plaintiff is correct that "even if [Ms. Vanca] used sexual epithets equal in intensity and in an equally degrading manner against male employees, [s]he cannot thereby 'cure' h[er] conduct toward women," Steiner, 25 F.3d at 1464, there is nothing in the record to suggest that Ms. Vanca used the word "bitch" to degrade women because of their gender; the word was not used as a gender-based insult. Plaintiff specifically states that Ms. Vanca "used the word 'bitch' repeatedly to and about women whose *conduct or actions* she did not like." (Dkt. #113, p.9) (emphasis added). There is no evidence that gender animus, as opposed to animus towards individuals based on their conduct or actions, motivated Ms. Vanca to sometimes call male and female employees "bitches." Plaintiff cites the Court to Kriss v. Sprint Communications Co., Ltd. Partnership for the proposition that "[p]erhaps if the evidence were that [the alleged harasser] regularly used the word 'bitch' as a synonym for 'complain,' the plaintiff's case would be stronger, because that would furnish some evidence that [the harasser] associated complaining with females." 58 F.3d 1276, 1281 (8th Cir. 1995). However, in Kriss, the court was discussing a male's labeling of females as "bitches," not a female's reference to both female and male employees as "bitches," like we have here. The fact that Ms. Vanca referred to both females and males as "bitches," although

1   certainly not curing the offensiveness of such comments, does appear to indicate that Ms.

2   Vanca did not make such remarks because she associates complaining only with females, as

3   opposed to males.  Female employees at Sun Health were not exposed to disadvantageous

4   terms or conditions of employment to which males were not exposed as a result of Ms.

5   Vanca's offensive remarks and conduct.  The Court can not find any evidence to support a

6   finding that Ms. Vanca's use of the word "bitch" is indicative of animus against females.

7           Second, apart from falsely telling employees that Plaintiff had gotten her nipples

8   pierced while Plaintiff and Ms. Vanca were at a convention together, an offensive though

9   non-gender related remark, there is no evidence that any gender-based comments were made

10  to Plaintiff.  Thus, even if Ms. Vanca's use of the word "bitch" could be considered gender-

11  based discrimination or harassment, there is no evidence that Ms. Vanca ever referred to

12  Plaintiff as a "bitch," only that Ms. Vanca sometimes referred to some of Plaintiff's male and

13  female co-workers as "bitches."  As such, Plaintiff asks the Court to find that a plaintiff who

14  has not been the subject of either race or sex-based discrimination or harassment can

15  nonetheless have an actionable Title VII workplace harassment claim by establishing that

16  some of her co-workers were subjected to race or sex-based discrimination.

17          Plaintiff cites the Court to Madani v. BHVT Motors, Inc., 2006 WL 1127149 (D.Ariz.

18  2006) (BROOMFIELD, J.) for the proposition that "an employee can establish a violation

19  of Title VII even if she was not the direct target of the hostility, or the racially charged words

20  were not directed at her."  (Dkt. #113, p.5).  However, Madani merely held that "the

21  testimony and evidence regarding [ ] alleged discrimination or harassment of persons of races

22  or national origins other than Plaintiffs' race and national origin [is] relevant."  2006 WL

23  1127149, at *2 (emphasis added).  This Court does not disagree.  However, in Madani, in

24  addition to the alleged discrimination and harassment of persons of races or national origins

25  other than the plaintiffs' race and national origin, the plaintiffs themselves were also direct

26  targets of racial discrimination.  Id. at *2, n.2 ("[Defendant] has not argued that Plaintiffs,

27  in this case, base their claims entirely on comments made to third parties.").  Madani

28  specifically noted that it was not a case, like here, "where the plaintiff asserted hostile

1   environment claims based solely on offensive comments directed at third parties and those

2   of a different race than plaintiff." Id.

3        The Ninth Circuit has also stated that a plaintiff "may establish a violation of Title

4   VII, even if such hostility was not directly targeted at the plaintiff." McGinest, 260 F.3d at

5   1117. However, the Ninth Circuit went on to clarify that statement, specifically holding that

6   "[i]f racial animus motivates a harasser to make provocative comments in the presence of an

7   individual *in order to anger and harass him*, such comments are highly relevant in evaluating

8   the creation of a hostile work environment, regardless of the identity of the person to whom

9   the comments were superficially directed." Id. at 1118. Here, Plaintiff does not allege that

10  Ms. Vanca's conduct directed at Plaintiff's co-workers was done in order to anger and harass

11  Plaintiff, and regardless, there is no evidence to support such a contention even if it were

12  made. Further, in McGinest, as in Madani, the plaintiff himself was the subject of some of

13  the discrimination and harassment that permeated his workplace. McGinest, 360 F.3d at

14  1117-18. In McGinest, the plaintiff presented evidence that he "was subjected to extreme

15  racial insults, as well as more subtle taunts, by supervisors and coworkers. Racist graffiti ...

16  regularly appeared in the bathroom and on equipment, and on one occasion a

17  management-level employee called McGinest 'stupid nigger' to his face." Id. at 1115.

18       Moreover, the cases cited by Plaintiff in support of the proposition that a plaintiff may

19  establish a Title VII violation even if the plaintiff was not the direct target of discrimination,

20  refer merely to the relevance of racial and sexual harassment against a plaintiff's co-workers

21  in addition to discrimination and harassment directed at the plaintiff herself. See, e.g.,

22  Woods v. Graphic Communications, 925 F.2d 1195, 1202 (9th Cir. 1991) (holding that work

23  environment was racially hostile where the plaintiff was surrounded by racial hostility, *and*

24  *subjected directly to some of it*) (emphasis added); Stingley v. Arizona, 796 F.Supp. 424, 428

25  (D.Ariz. 1992) (finding racial and sexual harassment *based in part on* use of racist nicknames

26  and slurs about another worker in presence of the plaintiff) (emphasis added).

27  Discrimination and/or harassment based on a protected characteristic such as race or gender

28  against a plaintiff's co-workers is relevant, not dispositive, in establishing an actionable

1   claim for hostile work environment under Title VII.  See, e.g., Kortan at 1114-15 ("These
2   sexist, hostile statements about others are relevant to show [that the plaintiff] was subjected
3   to a hostile work environment."); Oncale, 523 U.S. at 80 (concluding that actionable hostile
4   work environment includes "general hostility to the presence of women in the workplace").
5   Although the Court can envision a situation in which a plaintiff might be able to assert an
6   actionable Title VII hostile work environment claim where, although the plaintiff was never
7   subjected to direct race or sex-based discrimination or harassment herself, other members of
8   the plaintiff's race and/or gender were severely and pervasively subjected to discrimination,
9   that is not the situation here.  See Heyne v. Caruso, 69 F.3d 1475, 1480 (9th Cir. 1995)
10  (concluding that "conduct tending to demonstrate hostility towards a certain group" is
11  relevant to show discrimination against an employee who is a member of that group); Cruz
12  v. Coach Stores, Inc., 202 F.3d 560, 570 (2nd Cir. 2000) (stating that remarks targeting
13  members of other minorities may contribute to the overall hostility of the working
14  environment for a minority employee).  But here, Plaintiff does not allege that Ms. Vanca
15  discriminated against other members of her race (Caucasian), and as discussed above, there
16  is no evidence to support a finding that Ms. Vanca's comments that were directed towards
17  other females exhibited gender-based animus.  Accordingly, the Court finds that Plaintiff has
18  not established a prima facie hostile work environment claim under Title VII; Plaintiff has
19  not submitted evidence from which a reasonable jury could find that she was subjected to
20  discrimination or harassment because of her race, color, religion, sex, or national origin.[2]

21

22          [2]Defendant also asserts that it is entitled to an affirmative defense because Plaintiff
23  "unreasonably failed to take advantage of [Defendant's] preventive measures" by failing to
    report the alleged harassment to the appropriate individuals pursuant to Defendant's
24  harassment policy.  (Dkt. #125, p.8).  However, because the Court has determined that
    Plaintiff has not established a prima facie claim for hostile work environment, the Court need
25  not determine whether Defendant asserts a valid defense. See Nichols v. Azteca Rest. Enter.,
26  256 F.3d 864, 877 (9th Cir. 2001) (stating that although "[a]n employer is vicariously liable
    for a hostile environment created by a supervisor," "an employer may raise a two-pronged
27  affirmative defense to avoid [such] liability . . . .")  (citing Faragher, 524 U.S. at 780);
28  McGinest, 360 F.3d at 1119 n.12 ("The employer must show that 1) it exercised reasonable

1          **B.     Disparate Treatment**

2          Plaintiff's Title VII disparate treatment claim is governed by the "prima facie case and

3   burden-shifting paradigm" set out in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792

4   (1973). "Under <u>McDonnell Douglas</u>, a plaintiff alleging disparate treatment under Title VII

5   must first establish a prima facie case of discrimination." <u>Chuang v. University of Cal. Davis</u>

6   <u>Bd. of Trustees</u>, 225 F.3d 1115, 1123 (9th Cir. 2000). Specifically, Plaintiff must establish

7   that (1) she belongs to a protected class, (2) she performed according to her employer's

8   legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly

9   situated individuals outside her protected class were treated more favorably. <u>McDonnell</u>

10  <u>Douglas</u>, 411 U.S. at 802; <u>Chuang</u>, 225 F.3d at 1123. "The burden of production, but not

11  persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory

12  reason for the challenged action. If the employer does so, the plaintiff must show that the

13  articulated reason is pretextual 'either directly by persuading the court that a discriminatory

14  reason more likely motivated the employer or indirectly by showing that the employer's

15  proffered explanation is unworthy of credence.'" <u>Chuang</u>, 225 F.3d at 1123-24 (quoting

16  <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 256 (1981)). "Under the

17  <u>McDonnell Douglas</u> framework, '[t]he requisite degree of proof necessary to establish a

18  prima facie case for Title VII . . . on summary judgment is minimal and does not even need

19  to rise to the level of a preponderance of the evidence.'" <u>Id.</u> at 1124 (quoting <u>Wallis v. J.R.</u>

20  <u>Simplot Co.</u>, 26 F.3d 885, 889 (9th Cir. 1994)).

21         The first and second factors are undisputed; Defendant only contends that Plaintiff has

22  failed to show that she suffered an adverse employment action and that she was treated

23  differently than similarly situated employees outside her protected class. (Dkt. #125, p.9).

24  In response, Plaintiff contends that Ms. Vanca, a Caucasian female, clearly exhibited

25  "favoritism of non-Whites over Whites and males over females."  (Dkt. #113, p.14).

26  _____

27  care to prevent and correct promptly any invidious harassment, and 2) that the plaintiff
    unreasonably failed to take advantage of any preventative or corrective opportunities
28  provided by the employer or avoid harm otherwise.").

1    Specifically, Plaintiff points to evidence that Ms. Vanca "played favorites" with Alice

2    Montoya, a Hispanic woman, Pete Molina, a Hispanic man, and Frankie Fierro, a Hispanic

3    man, by, among other things, vacationing with them, taking them out to long lunches and

4    baseball games, and favoring them in scheduling and assignments.  (Id., pp. 14-15).  In

5    addition, Plaintiff states that Ms. Vanca took Jimmy Welch, a Caucasian man, and Ms.

6    Vanca's personal assistant, out to breakfast.  (Id., p.15).

7         With respect to the requirement that disparate treatment occur between "similarly

8    situated employees," "individuals are [considered] similarly situated when they have similar

9    jobs and display similar conduct."  Vasquez, 349 F.3d at 641.  As such, "[e]mployees in

10   supervisory positions are generally deemed not to be similarly situated to lower level

11   employees."  Id.; Hollins v. Atlantic Co., Inc., 188 F.3d 652, 659 (6th Cir. 1999) (holding

12   that, to be similarly situated, an employee must have the same supervisor, be subject to the

13   same standards, and have engaged in the same conduct).

14        Plaintiff, a Caucasian woman, was one of five charge nurses in Sun Health Del E.

15   Webb Hospital's Emergency Care Services Department ("ED").  (PSOF ¶¶ 1-2).  As a charge

16   nurse, Plaintiff was part of the ED management team and supervised between 25-30 nurses,

17   technicians, clerks, and volunteers.  (PSOF ¶ 4).  In addition to patient care services, Plaintiff

18   performed various supervisory responsibilities, including preparing staff work schedules and

19   work assignments, solving conflicts between staff members, and maintaining patient flow

20   within the ED.  (PSOF ¶ 4).  Plaintiff must present evidence that similarly situated non-white

21   individuals or male individuals were treated more favorably.  Mr. Welch was an

22   administrative assistant, Mr. Molina was an ED technician, and Mr. Fierro and Ms. Montoya

23   were staff nurses.  (PSOF ¶ 44; PCSOF ¶¶ 42, 44).  Clearly, an administrative assistant and

24   a charge nurse do not have similar jobs; a charge nurse is in a supervisory position and an

25   administrative assistant is a lower level employee.  The same is true for ED technicians and

26   staff nurses; Plaintiff held a supervisory position over such employees.  However, in order

27   to determine whether employees are similarly situated, the Court must look to the specific

28   situation and treatment involved, and whether the favorable treatment was equally available

to the plaintiff and her comparators. The favorable treatment at issue here was, among other things, getting favorable shifts and work assignments. However, there is no evidence in the record that Plaintiff and her alleged comparators competed for the same shifts and assignments. As such, it does not appear that Plaintiff and her comparators were sufficiently similarly situated to establish a prima facie case of disparate treatment.

In addition, although Plaintiff contends that she suffered an adverse employment action because Ms. Vanca allegedly denied her extra shifts and particular work assignments, Plaintiff points to nothing in the record to support these specific contentions other than a few general and self-serving statements that Ms. Vanca treated some of her co-workers more favorably. More importantly, there is nothing in the record to establish that Hispanics or males were given extra shifts or particular work assignments that Caucasians or females were denied. In her response to Defendant's motion for summary judgment, Plaintiff contends that she was allegedly given a "corrective action" discipline for her behavior, but that Mr. Molina and Mr. Welch were not disciplined for their "nasty" behavior. (Dkt. #113, p.18). However, there is no indication that Mr. Molina and Mr. Welch's conduct was similar to Plaintiff's conduct or that, for the purposes of a "corrective action," Mr. Molina, Mr. Welch, and Plaintiff were all similarly situated.

Further, although Plaintiff contends that Ms. Vanca treated males more favorably than females, Plaintiff states that Ms. Montoya, a female, was also given favorable treatment. In addition, Plaintiff contends that Ms. Vanca treated Hispanics more favorably than Caucasians, but then contends that Mr. Welch, a Caucasian, was also given favorable treatment. To establish her prima facie case, Plaintiff must show that her adverse employment action "occurred under circumstances giving rise to an inference of discrimination." Aragon v. Republic Silver State Disposal Inc., 292 F.3d 654, 660 (9th Cir. 2002) (citations and quotations omitted). Like Vasquez, and as discussed above, Plaintiff has not offered any direct evidence that Ms. Vanca was motivated by discriminatory intent. See Chuang, 225 F.3d at 1128 (finding direct evidence of pretext where member of decision-making body stated that "two chinks ... were more than enough") (internal quotation marks

omitted); Cordova v. State Farm Ins. Cos., 124 F.3d 1145, 1149 (9th Cir. 1997) (finding direct evidence of pretext when employer referred to another employee as a "dumb Mexican"). Plaintiff's allegations regarding race and gender discrimination are belied by her own statements that Ms. Vanca treated favorably both Hispanics (Molina, Fierro, Montoya) and non-Hispanics (Welch) favorably, and both males (Molina, Fierro, Welch) and females (Montoya).

"To establish a prima facie case of unlawful employment discrimination, a plaintiff must offer evidence that 'gives rise to an inference of unlawful discrimination' either through the elements articulated in McDonnell Douglas or by more direct evidence of discriminatory intent." Green v. Seattle Art Museum, 2008 WL 2180144, at *3 (W.D.Wash. 2008) (quoting Vasquez, 349 F.3d at 640). Although the record establishes that Ms. Vanca may have treated particular employees, male and female, Hispanic and non-Hispanic, favorably, there is no evidence, direct or indirect, to support a reasonable inference of unlawful race or gender discrimination under Title VII. As such, the Court finds that Plaintiff has not met her burden to establish a prima facie case of disparate treatment based on her race and/or gender.

## C. Whistleblower Claim

A "whistleblower" is an employee "who exposes wrongdoing on the part of his employer and is then discharged." Wagner v. City of Globe, 150 Ariz. 82, 88 (1986). Plaintiff contends that Defendant violated the Arizona Employment Protection Act ("AEPA"), A.R.S. § 23-1501 et seq., by firing her for engaging in protected whistleblowing activities, i.e., reporting, among other things, her concerns about patient safety. (Dkt. #18, p.113).

AEPA provides, in pertinent part:

(c) The employer has terminated the employment relationship of an employee in retaliation for any of the following: . . . (ii) The disclosure by the employee in a reasonable manner that the employee has information or a reasonable belief that the employer, or an employee of the employer, has violated, is violating or will violate the Constitution of Arizona or the statutes of this state to either the employer or a representative of the employer who the employee reasonably believes is in a managerial or supervisory position and has the authority to investigate the information provided by the employee and to take

> action to prevent further violations of the Constitution of Arizona or statutes of this state or an agency of a public body or political subdivision.

A.R.S. § 23-1501(c)(ii).  As such, Plaintiff must establish three elements: (1) that she had a good faith, reasonable belief that Defendant violated or was violating state law; (2) that she disclosed her belief in a reasonable manner to someone that she believed had the authority to investigate the alleged violation and take action to prevent further violations; (3) that her disclosure was a substantial motivating factor in Defendant's decision to terminate her employment.  See Murcott v. Best Western Int'l, Inc., 198 Ariz. 349, 356-360 (2000).

AEPA requires only that Plaintiff had a reasonable belief that Defendant violated state law.  Plaintiff states that she believed that the safety concerns she reported violated standards set forth in the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO").  JCAHO is a non-profit, national accreditation organization.  (DSOF ¶16).  According to Plaintiff, the JCAHO standards have generally been adopted and approved pursuant to A.R.S. § 36-405(A) ("The director shall use the current standards adopted by the joint commission on accreditation of hospitals and the commission on accreditation of the American osteopathic association or those adopted by any recognized accreditation organization approved by the department as guidelines in prescribing minimum standards and requirements under this section.").  (PCSOF ¶16).  Thus, even if Plaintiff stated that her safety concerns were about violations of JCAHO standards, since the JCAHO standards or similar standards appear to have been adopted by Arizona law, the Court finds that Plaintiff could have reasonably believed that her safety concerns also amounted to violations of state law.

However, Defendant also contends that Plaintiff's purpose in reporting the alleged safety violations were not to report illegality but to question disparate discipline of staff and improper supervision.  See Dahlberg v. Lutheran Social Services of North Dakota, 625 N.W.2d 241, 256 (N.D. 2001) (concluding based on the record, "reasonable minds could only conclude that [Plaintiff's] statements . . . were made for the purpose of questioning disparate discipline of staff for incidents of inadequate supervision and not for the purpose of reporting

an illegality"). Indeed, if Plaintiff was merely raising her safety concerns in the context of improper supervision and lack of accountability, then Plaintiff's reports would likely not constitute a good faith attempt to expose illegalities in the workplace and thus Plaintiff would not have an actionable whistleblower claim. But although the record indicates that Plaintiff's safety concerns were based on her belief that there was a lack of supervision and accountability, they also appear to have been made to inform Defendant of violations of state law and safety standards. (PCSOF ¶18). As such, drawing all reasonable inferences in favor of the nonmoving party, the Court cannot find, at this time, that no reasonable person could find that Plaintiff's reports were made for the purpose of reporting an illegality.

In addition, Defendant contends that Plaintiff's complaints did not constitute protected disclosures under AEPA because Defendant was already aware of and addressing Plaintiff's safety concerns. (Dkt. #107, p.15). To support this contention, Defendant points to the fact that Ms. Vanca was hired to address safety concerns about patient wait times, patient Ids, and medication handling. (DSOF ¶¶ 7-8). However, although Ms. Vanca may have been hired to address safety concerns in general, there is no indication that Ms. Vanca or Defendant did anything to address the specific safety concerns that Plaintiff raised in her complaints. Contrary to Defendant's contentions, the Court does not find that the record adequately establishes that "[Defendant] already had identified and Ms. Vanca was proactively attempting to resolve the same concerns about which [Plaintiff] allegedly complained." (Dkt. #125, p.15). In addition, the Court is not persuaded by Defendant's argument that because Plaintiff was directed to report safety violations and concerns to her superiors, she can therefore not assert an actionable claim under AEPA for whistleblowing. Defendant cites the Court to no Arizona case law in support of such a contention, and the Court finds that such a holding would be contrary to public policy and the purpose behind A.R.S. § 23-1501(c)(ii).

Lastly, Defendant contends that Plaintiff cannot show that her alleged safety complaints were a substantial motivating factor in her termination. (Dkt. #107, p.16). Defendant cites to various portions of the record and states that Plaintiff "admits that she

1   believes her termination was based on any number of factors, including her complaints about

2   Ms. Vanca's alleged harassment and discrimination, her threat to step down from her position

3   as charge nurse and [sic] and/or work in another department in the hospital and her failure

4   to invite Ms. Vanca to her dinner party." (Dkt. #125, p.16).  Nonetheless, after reviewing

5   the record, it is clear that Plaintiff alleges that she was fired because of Ms. Vanca's allegedly

6   discriminatory conduct and Plaintiff's complaints regarding alleged patient safety issues and

7   violations of patient confidentiality.  (PCSOF ¶¶ 22-25).  On summary judgment, the Court

8   must draw all reasonable inferences in Plaintiff's favor and may not make credibility

9   determinations or weigh conflicting evidence.  As such, although Plaintiff must ultimately

10   prove that her alleged safety complaints were a *substantial* motivating factor for her

11   termination, the Court finds that that is a question of fact more properly reserved for the fact-

12   finder in this case.

13   **D.   Retaliation**

14   "In order to establish a prima facie case of retaliation, [Plaintiff] must demonstrate that

15   (1) she had engaged in a protected activity; (2) she was thereafter subjected by her employer

16   to an adverse employment action; and (3) a causal link existed between the protected activity

17   and the adverse employment action." Porter v. California Dept. of Corrections, 419 F.3d

18   885, 894 (9th Cir. 2005) (citing Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000)).

19   If Plaintiff provides sufficient evidence to show a prima facie case of retaliation, then the

20   burden shifts to Defendant to articulate some legitimate, non-retaliatory reason for its actions.

21   Id.  If Defendant sets forth such a reason, then Plaintiff bears the burden of submitting

22   evidence to establish that Defendant's proffered reason is merely a pretext for an underlying

23   retaliatory motive. Id.; Johnson v. Transportation Agency, Santa Clara County, California,

24   480 U.S. 616, 626 (1987) ("Once a plaintiff establishes a prima facie case that race or sex has

25   been taken into account in an employer's employment decision, the burden shifts to the

26   employer to articulate a nondiscriminatory rationale for its decision.").  Defendant does not

27   dispute, at this stage, that Plaintiff engaged in a protected activity and was subjected to an

28

1   adverse employment action.  (Dkt. #107, p.13).  Defendant contends that Plaintiff cannot

2   establish a causal link between her alleged protected activity and her termination.  (Id.).

3       Proximity of time between a protected activity and an adverse action may support an

4   inference of causation.  Ray, 217 F.3d at 1244; Villarimo v. Aloha Island Air, Inc., 281 F.3d

5   1054, 1065 (9th Cir. 2002) ("[I]n order to support an inference of retaliatory motive, the

6   termination must have occurred fairly soon after the employee's protected expression.")

7   (citation and quotations omitted).  However, "[i]t is important to emphasize that it is

8   causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and

9   temporal proximity merely provides an evidentiary basis from which an inference can be

10  drawn."  Porter, 383 F.3d 1018, 1030 (9th Cir. 2004).

11      Defendant contends that a reasonable inference of causation between Plaintiff's

12  alleged protected activity and an adverse employment action because "[Plaintiff] has

13  presented vacillating theories of the true reason for her termination: she complained about

14  alleged safety violations in the ED; she threatened to step down as charge nurse and leave

15  the ED; and she failed to invite [Ms. Vanca] to a dinner party."  (Dkt. #125, p.12).  But

16  Plaintiff, on the other hand, contends that she was fired primarily for raising issues of

17  discrimination and harassment, as well as safety violations in the ED.  (Dkt. #113, p.11).

18      Although there were several instances over an extended period of time where Plaintiff

19  contends that she engaged in a protected activity by raising her concerns about alleged

20  discrimination and safety violations (DSOF ¶¶ 22-25, 32; PCSOF ¶¶ 6-7, 10-11, 15-18, 20-

21  21), this is not a situation where an employee systematically engages in protected activity and

22  thus proximity in time no longer effectively connotes increased probability of

23  interconnectedness between the adverse action and the protected activity.  Instead, Plaintiff

24  states that each time she engaged in some form of protected activity, she was subsequently

25  retaliated against – (1) after Plaintiff told Ms. Vanca, as well as HR Director Gary Pastore,

26  that she might step down as charge nurse and leave the ED because of Ms. Vanca's conduct

27  and the unsafe conditions in the ED, Ms. Vanca allegedly retaliated against Plaintiff by

28  issuing the February 28, 2005 written discipline and refusing Plaintiff extra work shifts

1    (PCSOF ¶¶ 15-18, 20-21, 23, 26; DSOF ¶¶ 22-25); (2) Plaintiff attempted to again report her

2    concerns regarding Ms. Vanca's alleged discrimination and harassment, among other things,

3    during the May 5, 2005 meeting, after which she was fired, that same day (DSOF ¶32;

4    PCSOF ¶¶ 32-36).  Further, the Court notes that the February 28, 2005 corrective action

5    discipline, which Plaintiff disputes having received, appears to have been the first corrective

6    action discipline that Plaintiff had received in 17 years.  (PCSOF ¶26).  As such, the Court

7    finds that there is sufficient evidence from which a reasonable juror might infer that the

8    adverse employment action taken by Defendant was the product of a retaliatory motive from

9    reporting alleged discriminatory conduct and harassment, as well as safety concerns.

10        In its reply brief, Defendant argues for the first time that "even if [Plaintiff] could

11   establish her prima facie case, which she cannot, she cannot meet her burden to show that

12   [Defendant's] proffered reasons for her termination are a pretext for retaliation."  (Dkt. #125,

13   p.13).  However, arguments raised for the first time in a reply are generally not considered

14   by the Court, because to do so unfairly deprives the opposing party of the opportunity to

15   meaningfully respond.  See, .e.g., Pacific Coast Federation of Fisherman's Ass'n v. U.S.

16   Bureau of Reclamation, 138 F. Supp. 2d 1228, 1248 n. 17 (N.D.Cal. 2001).  In addition,,

17   after viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable

18   inferences in her favor, the Court finds that it is possible that a reasonable fact-finder could

19   find that Defendant's proffered reasons for terminating Plaintiff's employment were

20   pretextual.

21        "Once the plaintiff has established a prima facie case, the burden of production

22   devolves upon the defendant to articulate some legitimate, non-retaliatory reason for the

23   adverse action."  Cohen v. Fred Meyer, Inc., 686 F.2d 793, 796 (9th Cir. 1982) (citations

24   omitted).  Defendant articulates the following as its legitimate, non-retaliatory reasons for

25   firing Plaintiff: "complaints received by [Defendant], [Plaintiff's] unprofessional conduct

26   during her disciplinary meeting with [Plaintiff], and the information [Defendant] learned

27   from exit interviews."  (Dkt. #125, p.13).  Given Defendant's articulated reasons for the

28   adverse action, Plaintiff must present evidence that raises a genuine factual question as to

1   whether that articulated reason is pretextual.  See Chuang, 225 F.3d at 1126.  In meeting her

2   burden of production, Plaintiff may rely on the evidence already introduced in establishing

3   her prima facie case.   Yartzoff v. Thomas, 809 F.2d 1371, 1377 (9th Cir.1987).  Plaintiff

4   "may establish pretext through evidence showing that [Defendant's] explanation is unworthy

5   of belief or through evidence showing that [retaliation] more likely motivated its decision."

6   Pottenger v. Potlach Corp., 329 F.3d 740, 746 (9th Cir. 2003).   Abnormalities in the

7   employer's handling of a complaint against its employee may be circumstantial evidence of

8   discrimination.   Calmat Co. v. U.S. Dep't of Labor, 364 F.3d 1117, 1122-23 (9th Cir. 2004)

9   (upholding finding of illegal motivation given an unusually severe reaction to a complaint

10  by an employer, including suspension without pay where other complaints had been treated

11  less severely).

12        Defendant's alleged non-retaliatory reasons for firing Plaintiff are based on employee

13  complaints and exit interviews about Plaintiff's performance and conduct, as well as

14  Plaintiff's alleged "unprofessional conduct" during one particular meeting.   However,

15  Plaintiff disputes those complaints, and, as stated above, submits evidence that each time she

16  attempted to engage in a protected activity, i.e., raising concerns about alleged discrimination

17  and unsafe workplace conditions, Plaintiff was retaliated against and subjected to adverse

18  employment actions.   Further, the Court notes that other than the February 28, 2005

19  corrective action discipline, which Plaintiff contends she never even received, there appears

20  to have been no other corrective action discipline taken against Plaintiff in 17 years.  In light

21  of those circumstances, Plaintiff's immediate termination appears to have been an unusually

22  severe reaction.   As such, the Court finds that there is sufficient evidence and supported

23  reasonable inferences of arguably questionable employer motivation to survive summary

24  judgment.

25        **Accordingly,**

26        **IT IS HEREBY ORDERED** that Plaintiff's motions to strike (Dkt. #s 117, 132) are

27  DENIED IN PART and GRANTED IN PART.  For reasons stated in the above order,

28  Defendant's Exhibit "M" is struck from the record.

1    **IT IS FURTHER ORDERED** that Defendant's motion to strike (Dkt. #126) is

2  DENIED.  However, pursuant to Plaintiff's withdrawal of Exhibit "K," Plaintiff's Exhibit

3  K is struck from the record.

4    **IT IS FURTHER ORDERED** that Defendant's motion for summary judgment (Dkt.

5  #107) is GRANTED IN PART and DENIED IN PART.  Plaintiff may proceed on her

6  whistleblower and retaliation claims.

7    DATED this 26th day of September, 2008.

8

9

10  _____
11  Mary H. Murguia
    United States District Judge
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28